The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
December 24, 2025

## 2025COA96

**No. 24CA0231, *In re Marriage of Teruel De Torres* — Family Law — Uniform Dissolution of Marriage Act — Modification of Custody or Decision-making Responsibility; Civil Procedure — Declaratory Judgments**

A division of the court of appeals concludes that, when adjudicating a dispute concerning which name the parents should use when referring to their minor child, a district court may not rely on C.R.C.P. 57 to modify a prior order allocating decision-making authority under section 14-10-131(2), C.R.S. 2025, of the Uniform Dissolution of Marriage Act. This is because section 14-10-131(2) has specific statutory requirements with which the court must comply that are absent from the court's determination of whether to grant declaratory relief.

The division also concludes that, if the court restricts either parent's public speech concerning the child's name, that content-

based restriction must satisfy the demanding standard from *In re Marriage of Newell*, 192 P.3d 529, 536 (Colo. App. 2008), to justify an infringement on the parent's First Amendment rights. The division provides guidance by analyzing factors other courts have considered when addressing free speech rights in the context of parental non-disparagement orders.

Court of Appeals No. 24CA0231
Jefferson County District Court No. 19DR683
Honorable Randall C. Arp, Judge

In re the Marriage of

Jocelyn Javernick,

Appellant,

and

Juan Javier Teruel De Torres,

Appellee.

ORDER REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE JOHNSON
Welling and Lipinsky, JJ., concur

Announced December 24, 2025

Griffiths Law PC, Duncan Griffiths, Christopher Griffiths, Kimberly Newton, Lone Tree, Colorado, for Appellant

Sherr Puttmann Akins Lamb PC, Tanya L. Akins, Denver, Colorado, for Appellee

¶ 1    This is the second appeal involving the parents' dispute over what name their minor child — whose full legal name is "Javier Reece Teruel" — should be called on a day-to-day basis in public.[1] *See In re Marriage of Teruel De Torres*, (Colo. App. No. 20CA0893, Aug. 26, 2021) (not published pursuant to C.A.R. 35(e)) (*Teruel De Torres I*).

¶ 2    In this post-dissolution of marriage proceeding involving Jocelyn Javernick (mother) and Juan Javier Teruel De Torres (father), mother appeals the district court's December 22, 2023 order (December 2023 order), which modified an earlier order and determined that, under C.R.C.P. 57, which governs declaratory judgment claims, the parents may only refer to the child (1) by his full legal name when enrolling him in or completing forms for school, health care, or extracurricular activities and for "anything and everything else that requires a registration"; and (2) as "Javier"

---

[1] In our opinions, we generally do not refer to minor children by name. We also generally avoid references to other information that might identify a child. This case is an exception, however, given that the parents' primary dispute is about the child's name, and another division of this court has already issued an opinion in which the child's full name appears. *See In re Marriage of Teruel De Torres*, (Colo. App. No. 20CA0893, Aug. 26, 2021) (not published pursuant to C.A.R. 35(e)).

or "Javi" (and not his middle name, "Reece") in other public settings.

¶ 3　　Mother's appeal focuses on the court's second requirement, contending that (1) the court did not have jurisdiction to modify its prior order or grant relief under C.R.C.P. 57; and (2) the December 2023 order violates her freedom of speech and freedom to parent under the First and Fourteenth Amendments of the United States Constitution, respectively, as it restricts what she can call the child, as well as compels what she may say to third parties in public about his name.

¶ 4　　We address and decide an issue of first impression, whether — as mother contends — the court erred by applying C.R.C.P. 57 to modify the provision of the court's prior order addressing the name dispute.  Based on the procedural posture of the parents' dispute and the statutory framework of the Uniform Dissolution of Marriage Act (the UDMA), §§ 14-10-101 to -133, C.R.S. 2025, we determine that a district court may not rely on C.R.C.P. 57 to adjudicate a parent's request to modify a prior order concerning the allocation of decision-making responsibility because doing so improperly bypasses the modification standards specified in section 14-10-

131(2), C.R.S. 2025. In light of our agreement with mother — although not based on the reasons she advances — we reverse the December 2023 order.

¶ 5    Specifically, the court disregarded the language in section 14-10-131(2), which provides that a court must leave intact a prior order allocating decision-making responsibility unless the court finds one or more of the five circumstances specified in section 14-10-131(2)(a) through (2)(c). Because the court failed to consider whether any of those circumstances applied under the appropriate standard of proof, it improperly modified the prior order.

¶ 6    Therefore, on remand, the court must determine whether father's motion for declaratory relief filed on October 10, 2022 (October 2022 motion) satisfies the standards to modify the prior order under section 14-10-131(2). To that end, the district court may reopen the case, allow the parents to present additional evidence (especially given the passage of time during the pendency of this appeal), and conduct further proceedings consistent with this opinion.

## I.     Background

¶ 7     The court dissolved the parents' marriage in May 2020.  The parents have one child, who was born in September 2018.  The child's full legal name is Javier Reece Teruel.  During the dissolution proceedings, mother requested that the child's name be changed to Reece Teruel Javernick, claiming that the parents had called him Reece since birth.  Father objected, arguing that mother was trying to distance the child from him by changing the child's name, particularly as the child shares father's first name.

¶ 8     In the March 25, 2020 permanent orders (March 2020 permanent orders), the court denied mother's request to change the child's legal name on his birth certificate.  But the court found that the "strongest and most credible evidence [was that] the [parents] referred to the [c]hild [as] Reece since his birth" and that father had only recently begun calling the child "Javier," "Little Javier," "Little Javi," or "Javi."  The court found that allowing the parents to use two different names would be "confusing for the [c]hild" and, therefore, ordered the parents to call him "Reece" and to "require third parties, including family, friends and professionals" to call the child solely by that name.

¶ 9    The March 2020 permanent orders also adopted the parents' stipulation as to the allocation of decision-making responsibility, specifying that, while the parents had joint decision-making, in the event of a disagreement, mother had "tie-breaker authority on medical and education [decisions] until such time in the future that the [parents were] exercising equal parenting time via agreement or court order." Neither the parents' stipulation nor the March 2020 permanent orders addressed tiebreaking authority in the event the parents could not agree on what the child should be called in public. The March 2020 permanent orders further provided that, when the child turned four, the court would determine whether it was in the child's best interests to modify decision-making responsibilities so that neither parent had tiebreaking authority.

¶ 10   Father appealed the name portion of the March 2020 permanent orders, arguing that the district court lacked authority to direct the parents to call the child by a particular name. *See Teruel De Torres I*, slip op. at ¶ 14. A division of this court vacated that aspect of the permanent orders, concluding that a remand was necessary for further proceedings. *Id.* The division instructed the court (1) to ascertain whether mother's counsel had conceded the

name issue, thereby possibly rendering court intervention unnecessary; (2) to allow the parents to brief the issue more fully if it remained unresolved; or (3) to determine whether, through counseling, the parents had resolved the issue themselves. *Id.* at ¶ 19.

¶ 11 On remand, the parents continued to address other pending disputes, such as parenting time and child support. The court had appointed a parental responsibilities evaluator, Dr. Bill Fyfe (Dr. Fyfe), to assist with those issues. The court instructed that, if the parents had not reached an agreement on the child's name, Dr. Fyfe was to address the name issue in the report he was preparing for a February 2022 hearing. Specifically, the court asked Dr. Fyfe to address "the impact, if any, of referring to the minor child by different names in the two different households."

¶ 12 The court held two hearings, one in February 2022 and the other in March 2022, dealing with the parents' other issues involving parenting time and child support, as well as the child's name. Dr. Fyfe testified at the February 2022 hearing on his opinion about the child's name, recommending that the child be

6

referred to as "Javi." Following the hearings, the court set the matter for an oral ruling.

¶ 13 Also in March 2022, the parents entered into a stipulation (March 2022 stipulation), which the court adopted as an order, providing for equal parenting time starting in May 2022 and that the parents would have joint decision-making responsibility. This allocation of decision-making responsibility superseded the portion of the prior decree (i.e. the March 2020 permanent orders) vesting mother with tiebreaking authority in the event of an impasse.

¶ 14 The name issue, however, remained unresolved. The court issued an oral ruling on the name dispute, which it later adopted as a court order (March 2022 order). The March 2022 order "enjoined [the parents] from using anything other than the full name of Javier Reece Teruel on any official records, including school records, medical records, dental records, signups for plays, [and] signups for extracurricular activities." The court said "the child's name is Javier Reece Teruel and that's the name that will be used." The court ordered the parties to use the name Javier, in part, because the child was named after father, father's Puerto Rican heritage was

important to father, and testimony supported a conclusion that the parents had called the child by his first and middle names.

¶ 15 But the court noted its limited authority to enter an order addressing what the parents could call the child in their respective homes. The court said that the child could "go by one name in one family" home and "then go by another name in the other, but in the public eye and in the official records, it will be Javier Reece Teruel."

¶ 16 Neither parent appealed the March 2022 order.

¶ 17 In October 2022, father filed a motion seeking declaratory relief under C.R.C.P. 57 in the form of clarification of the March 2022 order. In his motion, father argued that an additional order was necessary because he had obtained evidence that the child was still being called Reece at preschool, at schools the parents were touring to possibly enroll the child, and at the pediatrician's office. He requested an order declaring that "the minor child shall be called Javier or Javi in the public eye." In response, mother said that she did not dispute the child's *legal name*, as she was using it on official documents. But she argued that the court lacked authority to "enter any declaratory judgment that requires teachers, doctors, and other non-parties to call the child any specific name."

She also challenged the March 2022 order on First Amendment grounds.

¶ 18    The court initially issued an order in November 2022 granting father's requested relief.  But mother filed a motion for reconsideration, contending that an evidentiary hearing was necessary to resolve disputed facts.  The court agreed, vacated its November 2022 order, and held an evidentiary hearing in July 2023 to resolve the factual disputes.

¶ 19    Following that hearing, the court issued its December 2023 order, determining that Rule 57 "was designed for the current issue and is completely applicable and appropriate" to "settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and is to be liberally construed and administered."  The court further said in the December 2023 order that its November 2022 order did not expand the March 2022 order but merely clarified the court's intent in entering such order.

¶ 20    The December 2023 order said "Javier will be enrolled in all programs and activities as Javier Reece Teruel and the staff/providers will be told he goes by Javier or Javi.  They will not be told he goes by 'Reece' or any other name."  It specified that

9

mother "may refer to Javier as Reece or any other name she wishes to use" but that "in all registrations, health care providers, school and school activities requiring registration[,] she shall refer to him as Javier or Javi."

¶ 21     In analyzing mother's First Amendment arguments, the court relied on the standards expressed in *In re Marriage of Newell*, 192 P.3d 529, 536 (Colo. App. 2008), and *In re Marriage of McSoud*, 131 P.3d 1208, 1216 (Colo. App. 2006), in which divisions of this court held that "proof that a parent's exercise of parental responsibilities caused 'actual or threatened physical or emotional harm to a child,'" *Newell*, 192 P.3d at 536 (quoting *McSoud*, 131 P.3d at 1216), would likely be "sufficient to establish a compelling state interest sufficient to justify interference with the parent's" freedom of religion or freedom of speech, *id.* But the "harm to the child . . . should not be simply assumed or surmised; it must be demonstrated in detail." *Id.* (quoting *McSoud*, 131 P.3d at 1216).

¶ 22     The court in its December 2023 order noted the "ongoing animosity" between the parents but concluded that, on the existing record, it could not "make the detailed and extensive findings of 'substantial harm' necessary to survive constitutional scrutiny."

Implicit in the court's holding that it could not "make the findings that the harm to Javier [wa]s so compelling so as to justify a restriction on Mother's free speech rights" was that the court was not restricting mother's First Amendment rights by requiring her to solely use the child's first name in public settings. The court did not address mother's argument regarding the applicability of section 14-10-129, C.R.S. 2025, which governs the modification of parenting time orders.

## II. Modifying an Allocation of Decision-Making Responsibility Order

¶ 23 Mother contends that the court lacked authority to modify the March 2022 order through the November 2022 order and similarly erred by entering the December 2023 order. Mother also asserts that the court did not have authority to modify the March 2022 order under C.R.C.P. 57 because the court could only amend its prior judgment under C.R.C.P. 59 or 60, and father did not seek relief under either of those rules. Father counters that the court properly exercised its jurisdiction to provide clarity and certainty regarding the parents' use of the child's name in public by declaring

the rights of the parents under C.R.C.P. 57 and that the court could modify or clarify its order as needed.

¶ 24 We agree with mother that the court lacked authority to modify the name provision under C.R.C.P. 57, but for different reasons than mother advances.

### A. Standard of Review and Applicable Law

¶ 25 Issues involving a court's jurisdiction, as well as a court's interpretation of court rules and statutes, are questions of law that we review de novo. *In re Marriage of Vega*, 2021 COA 99, ¶ 13. Whether the court applied the correct legal standard also presents a question of law that we review de novo. *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15.

¶ 26 When interpreting statutes, we give effect to the General Assembly's intent. *People v. Disher*, 224 P.3d 254, 256 (Colo. 2010). The courts use the rules of construction applicable to statutes when construing a Rule of Civil Procedure. *People v. McLaughlin*, 2023 CO 38, ¶ 23. To determine that intent, we first look at the statute's language and give the words their plain and ordinary meanings. *Roup v. Com. Rsch., LLC*, 2015 CO 38, ¶ 8. We read and consider the statute as a whole to give consistent, harmonious, and sensible

effect to all its parts, and we presume that the General Assembly intended the entire statute to be effective. *People v. Buerge*, 240 P.3d 363, 367 (Colo. App. 2009). If the statute's language is clear and unambiguous, we look no further. *People v. Jenkins*, 2013 COA 76, ¶ 12.

## B. Analysis

### 1. C.R.C.P. 57

¶ 27 Relying on *Toncray v. Dolan*, 593 P.2d 956, 957 (Colo. 1979), the court reasoned that the "primary purpose of [the] declaratory judgment procedure is to provide a speedy, inexpensive, and readily accessible means of determining actual controversies which depend on the validity or interpretation of some written instruction of law." The court said at the July 2023 hearing that C.R.C.P. 57 was coextensive with or a substitute for the UDMA. It noted, "Certainly a motion to modify could result in the same . . . result, a clarification of prior orders." And the court said that "as long as it doesn't modify decision making[] or restrict parenting time[,] it's a best interest standard that applies." Therefore, in its view, the court could clarify its March 2022 order as to what name the child

13

would be called in official documents by requiring the parents to only use one name when referring to the child in public.

¶ 28     But the court's use of C.R.C.P. 57 — regardless of whether father requested relief under that provision — disregarded the General Assembly's intent that district courts use the framework and standards in section 14-10-131(2) to determine whether to modify an order allocating decision-making responsibility. Specifically, as discussed below, the court was incorrect in saying it was simply clarifying its prior order.  Also, we disagree with the court that C.R.C.P. 57 is coextensive with or a substitute for the UDMA; the specific presumptions and standards for the modification of decision-making orders in section 14-10-131 are matters that a court should not consider under C.R.C.P. 57.  This is because when parents have joint-decision making authority — to which the parents had stipulated before the court decided the name dispute — the court must first determine whether the standards in section 14-10-131 are satisfied before analyzing whether one parent may be allocated sole decision-making authority with respect to the disputed issue.  Only once these steps are followed and there remains an impasse is the court authorized to act as a tiebreaker.

14

¶ 29    Even though the Colorado Rules of Civil Procedure apply to all proceedings under the UDMA, except as otherwise provided, *see* § 14-10-105(1), C.R.S. 2025, a statutory provision that governs substantive, rather than procedural, rights prevails over a conflicting supreme court rule, *see People v. Prophet*, 42 P.3d 61, 62 (Colo. App. 2001). As we discuss below, we conclude that the standards and presumptions in section 14-10-131(2) are not procedural but substantive. And to the extent Colorado's Uniform Declaratory Judgments Law, §§ 13-51-101 to -115, C.R.S. 2025, is likewise considered substantive, a maxim of statutory construction requires courts to apply the more specific statute, *see Jenkins v. Pan. Canal Ry. Co.*, 208 P.3d 238, 241 (Colo. 2009).

¶ 30    By concluding that the court erred by not adjudicating the parents' name dispute under section 14-10-131, we acknowledge that, at first blush, it may appear that we are violating the party presentation principle. Neither parent expressly sought relief under the UDMA, and, generally, we are bound by the party presentation rule requiring that we address only the issues raised by the litigants. *See Compos v. People*, 2021 CO 19, ¶ 35 ("In our adversary system, in both civil and criminal cases, in the first

15

instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (quoting *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008))).

¶ 31    The party presentation principle, however, does not obligate us to perpetuate parties' erroneous assertions of the law, nor does it require us to sit by and allow the district court to guess a course of action as to the correct governing law. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *accord Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 877 n.11 (3d Cir. 2022); *Torcivia v. Suffolk County*, 17 F.4th 342, 356 n.24 (2d Cir. 2021); *United States v. Robl*, 8 F.4th 515, 528 n.32 (7th Cir. 2021); *Does v. Wasden*, 982 F.3d 784, 792-93 (9th Cir. 2020).

¶ 32    We could simply vacate the court's order and conclude that C.R.C.P. 57 was an improper vehicle to decide the name issue,

without informing the court of the correct legal standard. This was the approach the prior division took. In *Teruel De Torres I*, slip op. at ¶ 19, the division simply stated that, if further proceedings were necessary on remand, the district court could "address the issue more thoroughly based on a fuller briefing of the legal issue." Certainly, at times, this court uses such broad language to provide the parties and district court with flexibility to conduct further proceedings on remand. But the complexity of this issue and the longstanding nature of the parents' dispute on this specific issue counsel us to take a more directive approach. Particularly because this is the parents' *second* appeal on this issue, we are loath to simply reverse the order without explaining why C.R.C.P. 57 was inapplicable and that the court should have applied section 14-10-131(2) to resolve the parents' name dispute.

## 2. The UDMA Framework

¶ 33    We agree with the division's interpretation of section 14-10-131(2) in *In re Marriage of Humphries*, 2024 COA 92M, ¶¶ 17-18. In that case, the division had to interpret section 14-10-131(2) because the district court had erroneously resolved a parenting time dispute by modifying decision-making responsibility under

17

subsections (2)(b) and (2)(h) of the parenting time statute, section 14-10-129.5, C.R.S. 2025. *Humphries* applied the plain language of the UDMA in rejecting the argument that a court could modify decision-making authority under those two subsections.

¶ 34　The division reasoned that the district court could not modify decision-making under section 14-10-129.5(2)(b) because the court misinterpreted what "previous order" meant. The provision states that, if a parent "has not complied with *the parenting time order or schedule* and has violated the court order," the court may issue "[a]n order modifying the *previous order* to meet the best interests of the child." *Humphries*, ¶ 13 (quoting § 14-10-129.5(2)(b)). The division determined that the term "previous order" referred to the prior parenting time order or schedule, not an allocation of decision-making responsibility order entered under section 14-10-131. *Id.*

¶ 35　Likewise, *Humphries* rejected the assertion that the court could modify decision-making authority under section 14-10-129.5(2)(h) — a "catch all" provision "that authorizes a court to issue '[a]ny other order that may promote the best interests of the child or children involved.'" *Id.* at ¶ 14 (quoting § 14-10-

18

129.5(2)(h)). The division concluded that the district court's expansive reading of subsection (2)(h) was inconsistent with the standards for modification of decision-making responsibility in section 14-10-131. *Id.*

¶ 36 *Humphries* then turned to the standards in section 14-10-131(2). That statute authorizes a district court to modify decision-making responsibility if it finds, "on the basis of facts that have arisen since the prior order or which were unknown to the court at the time of the prior order," that "(1) a change has occurred in the circumstances of the child or the party to whom decision-making responsibility was allocated, and (2) the modification is necessary to serve the child's best interests." *Humphries*, ¶ 17 (citing § 14-10-131(2)).

¶ 37 *Humphries* noted that, because the district court had decided decision-making responsibility under the parenting time statute instead of section 14-10-131, the court failed to address two specific requirements. *Id.* First, "the court did not presume that the prior order allocating decision-making responsibility must remain in effect absent a showing that one of the specified circumstances exists." *Id.* at ¶ 18. Indeed, section 14-10-131(2)

19

states that "'the court shall retain the allocation of decision-making responsibility established by the prior decree" — meaning the *existing* decision-making responsibility order — unless one or more of five specific circumstances exist. *Humphries*, ¶ 18 (quoting § 14-10-131(2)). The five circumstances are

> (a) The parties agree to the modification;
>
> (b) The child has been integrated into the family of [one party] with the consent of the other party and such situation warrants a modification of the allocation of decision-making responsibilities;
>
> (b.5) There has been a modification in the parenting time order pursuant to section 14-10-129 . . . that warrants a modification of the allocation of decision-making responsibilities;
>
> (b.7) A party has consistently consented to the other party making individual decisions for the child which decisions the party was to make individually or the parties were to make mutually; or
>
> (c) The retention of the allocation of decision-making responsibility would endanger the child's physical health or significantly impairs the child's emotional development and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child.

*Id.* (quoting § 14-10-131(2)). Second, the court did not give effect to or apply the heightened standard for modification of a prior order

20

under section 14-10-131(2)(c), which, in that case, was the only relevant subsection of the statute implicated.

¶ 38 Although we are not obligated to follow precedent from another division, we give deference to those decisions. *Est. of Becker v. Becker*, 32 P.3d 557, 563 (Colo. App. 2000), *aff'd sub nom.*, *In re Estate of DeWitt*, 54 P.3d 849 (Colo. 2002). We are persuaded by the statutory interpretation in *Humphries* and, therefore, adopt it. Indeed, *Humphries*' conclusion that the parenting time provisions in section 14-10-129.5 cannot substitute for the standards to modify decision-making responsibility under section 14-10-131(2) applies equally, if not more so, to our conclusion that a district court cannot use C.R.C.P. 57 to avoid applying the standards in section 14-10-131(2). We thus turn to how the court erred by not relying on section 14-10-131.

### a. The Prior Order

¶ 39 We first must identify what the court's "prior order" was in October 2022 — when father filed the October 2022 motion that resulted in the December 2023 order — because this is crucial to our analysis. Indeed, how the "prior order" is denominated affects the court's analysis of the section 14-10-131(2) presumption that

21

the "prior order" is retained unless one or more of the five circumstances in subsections (2)(a) through (2)(c) are satisfied.

¶ 40     Recall that father appealed the name portion of the March 2020 permanent orders, which resulted in *Teruel De Torres I*. Because, in that appeal, the division remanded the case to the district court for a ruling on the name dispute, the March 2020 permanent orders were not final as to that particular issue when *Teruel De Torres I* was announced. The March 2020 permanent orders only became final when the court decided the name issue in the March 2022 order — which enjoined the parents from calling the child anything but Javier Reece Teruel on official forms. Thus, when father filed his October 2022 motion for declaratory relief, the March 2022 order was the "prior order" the court needed to presume remained in effect unless one of the five circumstances in section 14-10-131(2)(a) through (2)(c) was satisfied.[2]

---

[2] This opinion is not intended to hold that every parental dispute concerning a minor child's name must be resolved through an allocation of decision-making responsibility order under section 14-10-131, C.R.S. 2025. But we need not decide the circumstances when a parents' dispute over a child's name would not be a "major" decision; in this case, the record supports it is a "major" decision, particularly given mother's prior request for a legal name change.

¶ 41    The March 2022 stipulation does not affect whether the March 2022 order was the "prior order" for section 14-10-131(2) purposes. In the March 2022 stipulation, the parents agreed to joint decision-making authority without a tiebreaker and equal parenting time starting in May 2022.  Thus, the March 2022 stipulation was a modification of decision-making responsibility authorized under section 14-10-131(2)(a), as the parents "agree[d] to the modification."  The March 2022 order on the name issue, however, only dealt with that particular dispute, an issue that the parents strongly contested.

¶ 42    Neither parent appealed the March 2022 order; thus, it is the "prior order" for purposes of the presumption that it must remain in effect and cannot be modified unless the court finds that new facts have arisen since the court entered such order, and one or more of the circumstances in 14-10-131(2)(a) through (2)(c) are satisfied.  In other words, because the parents had joint decision-making authority over the child's name, the court first had to determine whether the standards in section 14-10-131(2) were satisfied so that one parent could retain decision-making authority over this issue.  If the standards could not be satisfied, however, then — and

23

only then — could the court act as the tiebreaker. *See In re Marriage of Thomas*, 2021 COA 123, ¶¶ 36-37 (authorizing a court to act as a tiebreaker when parents with joint decision-making authority could not decide which school the child should attend).

¶ 43    Now that we have clarified which order is the "prior order," we turn to father's arguments in his October 2022 motion.

### b.    Father's October 2022 Motion

¶ 44    Father's October 2022 motion raised "facts that ha[d] arisen since the prior [order] or that were unknown to the court at the time of the prior [order]." § 14-10-131(2). Specifically, father alleged that, since the March 2022 order, the child was still being called "Reece" at preschool; mother had disenrolled the child from preschool based on either the name dispute or financial reasons; mother continued to call him "Reece" in the new educational setting; the teachers and the child's cubby at his new preschool referred to him as "Reece"; and mother had attempted to "manipulate" health care professionals to call the child "Reece." Given these new facts, father requested relief "declaring that the child should be called Javier in the public eye . . . as opposed to his

24

entire legal name which is Javier Reece Teruel pursuant to C.R.C.P. 57."

¶ 45    In addition to alleging the facts postdating the March 2022 order, father's October 2022 motion sought broader relief than that granted in the March 2022 order.  The court's March 2022 order ruled that the child must be referred to by his full name in all official forms, but it specifically declined to determine the name the parents were required to use when referring to the child in public. True, the court noted in the March 2022 order that the child must go by his full name "in the public eye and in the official records," but it did not specify what that meant with respect to what mother could or could not say to third parties about how she could refer to the child in public settings.

¶ 46    By initially granting father's October 2022 motion with its November 2022 order, and then later vacating it, the court recognized that new facts had arisen since the "prior order." Indeed, it determined it needed to hold a hearing — which it did in July 2023 — to resolve the factual disputes regarding the child's name.

¶ 47    Thus, we turn to the standards for modifying the March 2022 order.

### c.    Modification of the Prior Order

¶ 48    After resolving the factual disputes at the July 2023 hearing, the court should have determined whether it was required to retain the allocation of decision-making responsibility established by the "prior order" (i.e., the March 2022 order which, by then, the parents had stipulated to joint decision-making authority) or whether one or more of the five circumstances in section 14-10-131(2)(a) through (2)(c) were satisfied.  The court did not make findings on either basis.

¶ 49    Based on the record before us, the only relevant provision to warrant modification of the March 2022 order was section 14-10-131(2)(c), which provides that "[t]he retention of the allocation of decision-making responsibility would endanger the child's physical health or significantly impairs the child's emotional development and the harm likely to be caused by a change of environment is

26

outweighed by the advantage of a change to the child."[3] This is a "more stringent [standard] than the best interests of the child standard." *Humphries*, ¶ 20; *see also In re Marriage of Schlundt*, 2021 COA 58, ¶ 29 ("The policy behind requiring the more stringent endangerment standard" in the modification context "is to recognize the disruption such a change causes for the child and to promote stability for the child.").

¶ 50    The court presumed that its December 2023 order was simply a clarification of the March 2022 order. As noted above, it was not. It specifically modified what mother could say about the child's name in public and to third parties, essentially restricting her freedom of speech, as we address in Part III below. It stated "Javier will be enrolled in all programs and activities as Javier Reece Teruel," which the court had also said in the March 2022 order. But the December 2023 order also ordered that "the staff/providers will be told he goes by Javier or Javi. They will not be told he goes by 'Reece' or any other name." And it further provided that, while

---

[3] This opinion is not intended to restrict the parents or court from relying on any other relevant provision of the UDMA as the circumstances may warrant on remand.

mother must register the child in official documents under his full legal name, if she "then tell[s] teachers, health-care providers and staff that he goes by 'Reece,'" such actions are "contrary to the plain language of the Court's order and contrary to the intent of the Court's order."

¶ 51     Although the court may have believed it was only clarifying its "prior order," the December 2023 order placed specific, new restrictions on how mother could parent the child by telling her that she could only call him "Javier" or "Javi" in public settings. Therefore, any modification or expansion of the March 2022 order — when based on new facts not known to the court at the time of its "prior order" — must be decided under the standards in section 14-10-131(2).

¶ 52     "What constitutes endangerment is a highly individualized determination, and we won't disturb the trial court's findings on the issue if they are supported by the record." *In re Marriage of Wenciker*, 2022 COA 74, ¶ 26 (citation omitted).  Surely, the same is true of what constitutes significant impairment of a child's emotional development.  The court noted in its December 2023 order that the ongoing name dispute continued "to demonstrate to

Javi the angst and animosity . . . [m]other h[as] for . . . [f]ather and [i]s a day-to-day reminder of the ongoing hostility and conflict present in this divorce." But as part of its First Amendment analysis, the court likewise said it could not find that the parents' disagreement regarding the child's name caused him "substantial harm." And even though, at the February 2022 hearing, Dr. Fyfe recommended that the child go by "Javi," he also testified that the name dispute was "most likely not" causing the child trauma. Dr. Fyfe further said that "[p]eople respond to different names," noting that he himself had a nickname as a child.

¶ 53    We agree that the court addressed the new facts alleged in father's October 2022 motion involving mother's alleged conduct of manipulating teachers and doctors to refer to the child as "Reece." While the court focused, in part, on mother's conduct, it also seemed particularly concerned with the confusion and frustration of third parties who did not know how to refer to the child or who felt they were caught in the middle of the parents' dispute. While the court noted that the child could discern the parents' continued conflict relating to the name dispute, the court made no findings that, by February 2023, the child was suffering trauma that

"endanger[ed] [his] physical health or significantly impair[ed] [his] emotional development."  § 14-10-131(2)(c).

¶ 54    Therefore, we must vacate the December 2023 order because the court did not consider section 14-10-131(2) when entering it. We want to make clear that we express no opinion as to whether father's October 2022 motion or the resulting facts presented at the July 2023 hearing satisfied the heightened standard for modification of the March 2022 order under section 14-10-131(2)(c). Nor do we imply that section 14-10-131(2)(c) is the only provision in section 14-10-131(2) that may apply to the parents' dispute going forward.  Instead, we simply hold that the court on remand must resolve father's October 2022 motion by applying section 14-10-131(2).

¶ 55    Our reversal of the December 2023 order and remand instructions do not, however, end our inquiry, as we are still left with mother's constitutional arguments.  That is where we turn next.

### III. Any Court Order Must be Narrowly Tailored to Protect the Parents' Constitutional Rights

¶ 56 In the December 2023 order, the court said it could not find that mother's calling the child by his middle name was so harmful to the child "so as to justify a restriction on Mother's free speech rights." The court reiterated its ruling from the March 2022 order requiring that the child's full name be used in official registrations and documents. Although the court ruled that mother could call the child whatever name she liked in the privacy of her home, teachers and health care professionals were not to be told that the child "goes by 'Reece' or any other name." Mother claims that an order specifying what she may or may not tell third parties about the child's name implicates her free speech rights. We agree.

¶ 57 "Freedom of speech is protected under the First Amendment to the United States Constitution, which provides, in relevant part, that 'Congress shall make no law . . . abridging the freedom of speech . . . .'" *Newell*, 192 P.3d at 535 (quoting U.S. Const. amend. I). Mother's First Amendment challenge involves a content-based restriction, as the December 2023 order's restriction is "dependent solely on the nature of the message being conveyed" (i.e., her

preferred name for the child). *Carey v. Brown*, 447 U.S. 455, 461 (1980). The government may only regulate the content of constitutionally protected speech to promote a compelling state interest, and any such regulation must be narrowly tailored to achieve that end. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989); *see Denv. Publ'g Co. v. City of Aurora*, 896 P.2d 306, 311 (Colo. 1995).

¶ 58 In Colorado, "absent demonstrated harm to the child, the best interests of the child standard has been determined to be 'insufficient to serve as a compelling state interest overruling the parents' fundamental rights.'" *Newell*, 192 P.3d at 536 (quoting *In re Marriage of Ciesluk*, 113 P.3d 135, 145 (Colo. 2005)).

¶ 59 A showing that a parent's exercise of their free speech rights "threatened the child with physical or emotional harm, or had actually caused such harm, would establish a compelling state interest sufficient to justify a restriction" on the parent's rights. *Id.* The standard is "demanding," *id.*, as the actual or threatened harm to the child "must be 'substantial'" and "demonstrated in detail," *id.* (quoting *McSoud*, 131 P.3d at 1216).

¶ 60    The *Newell* division determined that a father's free speech rights were violated by a magistrate's order that barred him "from voicing his concerns about the child's care or education." *Id.* at 535. In concluding that the magistrate's order did not satisfy the high standard necessary to justify a restriction on father's speech, the division remanded the case for reconsideration of "whether restrictions on father's right to communicate with third parties regarding the child [we]re warranted" and, if so, to "make additional findings regarding the type and degree of harm that the child ha[d] suffered or may suffer because of the speech that [wa]s to be restricted," with the harm justifying the restriction "demonstrated in detail." *Id.* at 536.

¶ 61    As noted above, the district court could not justify a restriction on mother's speech because, though her continued opposition to calling the child by his first name might be harmful to the child, the court could not specifically articulate such harm in detail. Nonetheless, the court's December 2023 order prohibits mother from calling the child anything but his first name in public, and she cannot tell third parties that she prefers calling him by his middle name. At oral argument, the division raised many hypothetical

scenarios to both parents' counsel as to what, under the December 2023 order, mother may or may not be allowed to say to third parties about the child's name in public. Given the district court's near-blanket prohibition on calling the child anything but his first name in public, counsel's responses to our hypotheticals demonstrated that many circumstances could arise that would, under the speech restriction, subject mother to potential contempt without prior notice to her.

¶ 62 For example, under the existing December 2023 order, could mother say, "I must tell you by court order that my son must be called by his first name, but I prefer calling him by his middle name and you will hear me calling him by that name"? Or could mother say, "While my son is around me, I will call him by his first name but if we are alone in a parent-teacher conference, I will refer to him by his middle name because that is my preference"? In short, the December 2023 order is not narrowly tailored to the extent that it restricts what mother may call the child in public or what she might say to third parties in public about what she prefers to call the child.

¶ 63     On remand, before the court can restrict (or compel) either

parent's speech in public as to the child's name, it must point to

evidentiary support that the "demanding" standard is met by

showing that the harm to the child is "substantial," and it must

support that finding of harm "in detail." *Id.* (quoting *McSoud*, 131

P.3d at 1216).  The court's restriction of either parent's speech

about the child's name, in public or private, is a content-based

restriction that cannot simply be subject to the best interests of the

child standard without meeting the other heightened constitutional

standards.

¶ 64     If the court finds that the record supports a restriction (or

specific requirement) on either parent's speech related to the child's

name, the court must then consider whether the content-based

restriction or requirement is narrowly tailored to justify it.

¶ 65     As guidance, we turn to how courts in other jurisdictions have

analyzed "non-disparagement" clauses in domestic relations orders.

We recognize that non-disparagement clauses are not directly on

point, but we view the free speech analyses concerning these

provisions to be analogous to the free speech considerations

concerning the parents' name issue.  We do not opine as to the

constitutionality of a non-disparagement order generally but look at cases in which the court held the order was unconstitutionally overbroad. In the event the court justifies one parent using in public settings a court-ordered name for the child to which the parent objects, we provide this guidance to assist in ensuring that any restriction is narrowly tailored to prevent the "substantial" harm that the court "demonstrate[s] in detail." *Id.* (quoting *McSoud,* 131 P.3d at 1216).

¶ 66 For example, in *Israel v. Israel*, 189 N.E.3d 170, 180 (Ind. Ct. App. 2022), the court generally upheld a non-disparagement clause but determined it went too far because it prohibited the father from making any disparaging comments to "anyone," even when the child was not present. The appellate court held that the non-disparagement clause had to be modified to omit language prohibiting the father from making disparaging comments to "friends, family members, doctors, teachers, associated parties, co-workers, employers, the parenting coordinator, media, the press, or anyone." *Id.*

¶ 67 In determining whether a non-disparagement clause constitutes an unconstitutional prior restraint on speech, other

state courts have also looked at the breadth of the provision's language, including whether it prohibits statements outside the child's presence and whether it is too vague for a party to comply. *See, e.g., Shak v. Shak*, 144 N.E.3d 274, 280 (Mass. 2020) (concluding that a non-disparagement clause was an unconstitutional prior restraint on speech because neither father nor mother showed evidence that disparaging comments had been made around the child; that the toddler would even have understood such comments, assuming they were being made; and that any future harm to the child was anything other than "speculative"); *D'Ambrosio v. D'Ambrosio*, 610 S.E.2d 876, 886 (Va. Ct. App. 2005) (concluding that an order prohibiting husband from making any "defamatory comments" about his ex-wife to any "third parties" was too vague and overly broad for the husband to know what statements might subject him to contempt).

¶ 68 These cases illustrate the manner by which prior restraint on a parent's free speech rights must be narrowly tailored to withstand

First Amendment constitutional scrutiny.[4] To the extent the court's order limits what a parent may call the child in public or what the parent may or may not say to third parties about the child's name, the court must narrowly tailor any such restriction by considering, for example, whether (1) the parent's speech will be uttered in front of the child; (2) the parent's speech substantially harms the child, as opposed to whether there is harm or confusion to third parties; or (3) the restrictions are so vague so as to place the parent subject to the restrictions in a position that the parent's speech may be subject to contempt without notice.

## IV. Conclusion

¶ 69     We reverse the court's December 2023 order and remand the case to the district court to conduct further proceedings consistent with this opinion.

---

[4] Given that the court did not resolve the name dispute under section 14-10-131(2)(c), we decline to address mother's arguments regarding her right to parent under the Fourteenth Amendment's Due Process Clause. Because, on remand, the court may be presented with evidence sufficient to prove endangerment, it is not clear to us how the Fourteenth Amendment right to parent claim will be framed under the court's allocation of decision-making responsibility determination if the section 14-10-131 standard is satisfied.

JUDGE WELLING and JUDGE LIPINSKY concur.